Anderson, Bryant, and Santos. The matter of the United States v. Clark is on submission. With the court's permission, my name is John Marino. I represent Mr. Anderson. You've reserved three minutes for rebuttal. I did, Your Honor. The one issue that I just would like to briefly, orally argue is the career offender issue. We're respectfully requesting this court to remand Mr. Anderson back to be resentenced because the district court erred in holding that he was a career criminal. Mr. Anderson pled guilty to a state of Connecticut crime. It was an extremely broad crime, and since the high court held in United States v. Mathis that state crime elements that are broader than a federal offense cannot serve as a predicate under the Armed Career Criminal Act. If you look at the statute that Mr. Anderson pled guilty to, the state statute in Connecticut, it's extremely broad. In addition to that, when the allocution that he had The Connecticut statute is extremely broad? It's broad for what he pled to. It includes one element, offers. It includes everything, as I see it, everything that's forbidden under the Connecticut statute other than the word offers is within what would make one a career criminal.  That is correct, Your Honor. However, because the allocution was insufficient here, where a police report was read by the prosecutor in the allocution. In United States v. Cohen's, a district court, Burns, actually, I believe eight years prior to this, held that when you read a police report into evidence, it cannot be considered for a predicate under the Career Offender Act. And in this court, in this case, she actually held that it was. But when we look at the allocution, You made them confirm the accuracy of the police report? In this case, in our case. In our case, he confirmed and said it's basically okay. I mean, that was the allocution. It wasn't specific. There were no specific questions from the judge, nor did the prosecutor ask for any specific questions in the allocution. Therefore, when Mr. Anderson just stated on the road that it was basically, we don't know definitively, Your Honor, on what specific element. It could be that he offered or it could be part of that statute that doesn't give the rise to a predicate act under the Career Offender Act. And that's basically the argument for that. I thought your argument was, I thought that as of consideration of the new Supreme Court opinion in Mathis, and I haven't read Mathis yet, but I thought your argument was that because the state statute includes an element to it offering, which is not eligible to make somebody a career offender under the guidelines, that that ends the inquiry. And the fact that he was shown by the colloquy at the time of his conviction, at the time of his plea, to have possessed the drug rather than offer it, and possession would only be illegal under the Connecticut statute if it was with intent to sell or dispense, that the court simply cannot sustain the career criminal because the Connecticut statute applies generically to broader categories. Yes, that's one of the arguments. You're correct, Your Honor. If there are any other questions, I'll be happy to answer them. We reserve three minutes. Thank you. Good morning, Your Honor. David Morgan for Philip Bryant. Your Honor, we have addressed two sentencing issues concerning the determination of quantity in this case. Mr. Bryant was charged in the first count of the indictment with narcotics offenses involving cocaine, crack cocaine, and heroin. He was convicted of that count. As part of the jury deliberation, the jury made two factual findings concerning quantity. They found, beyond a reasonable doubt, that Mr. Bryant was involved in less than 28 grams of crack cocaine. They further found that Mr. Bryant was not involved in more than 28 grams of crack cocaine. At the sentencing, the court made a finding that a quantity of 196 grams of crack cocaine would form the basis of the guideline calculation, 168 grams more than the jury found. This is not a case under our law, such as Vaughan, which allows a court to use acquitted conduct to calculate a guideline range. It's not a case under United States v. Watts where the court would be justified in doing an additional calculation. Here, there is a specific upper limit finding of less than 28 grams. In U.S. v. Vaughan from the Second Circuit and other cases in the Second Circuit, it appears that we have been dealing with ranges when submitting issues to the jury. In Vaughan, I believe it was 50 to 150, and the court found it was hundreds of kilos. Here, we don't have a range. If you have a range, you know that the government proved, at best, the low end of the range. Here, we know that the government proved it was not more than 28 grams. I'm just curious. It's not clear to me. Why was this issue submitted to the jury? Why was the jury asked the amount? Because if it was 28 grams or more... I know the significance between the two, but the argument is that this was the government's argument, seems to be that it doesn't matter what the jury said because this was a question for the judge to decide. I'm just curious as to why. If that's true, why was the jury asked? Because I think in the appropriate cases, you have to make a determination of quantity which brings into effect mandatory minimums and whatnot. So they had to make a finding of a quantity which would expose him to mandatory minimum or not expose him to a mandatory minimum. And here, he was not exposed, after their finding, to the mandatory minimum. Now, in the brief, the government says that this could have come from the sentencing under a relevant conduct theory. I disagree with that because the exact same evidence at trial was presented at the sentencing hearing. We objected to this evidence coming in at trial, both in the motion in Limine and at the trial itself. The court ruled that this evidence was part of the conspiracy. In my brief, we've also alleged that there were three multiple independent conspiracies involved that the government brought under one umbrella indictment, and that was inappropriate. I'm going to rest on a brief because I think this is an issue that really needs to be addressed. But it was not new evidence at the sentencing hearing. It was the exact same evidence. The evidence at both the trial and the sentencing hearing was that Bryant sold 26 grams of crack in May of 2011, that he sold a small quantity, probably a $10 bag, of either crack cocaine or powder cocaine to a third party when Mr. Wilson, the cooperator witness, was in the car with him. Then there was a third sale where Mr. Wilson was also in the car where he thinks it was an eight ball, but he didn't know if it was an eight ball of crack or an eight ball of powder. Finally, even at the trial, Mr. Wilson was able to testify about a statement that Mr. Bryant reportedly made that he was doing more than 100 grams, but he never actually verified whether it was 100 grams of powder or 100 grams of crack. But in any event, the same evidence was adduced at the sentencing hearing as was put forth by the government at trial, which the jury outright rejected. So what we have is a finding by the jury of less than 28 grams. We have a contradictory finding by the district court judge that it was more than 28 grams, and that, I believe, Your Honor, is a violation of a Sixth Amendment right. You also say that even if the district judge could have made her own finding independent of the jury, that it's not supported because it's unclear whether the amounts above 20, whatever the jury found out, the exact amount, was not supported by the evidence. I believe it was not supported by the evidence at all. I'm out of time. If I can keep going, I will. Was there not testimony from Mr. Wilson? There was, and it was contradictory. It was inconsistent at best. He didn't remember a great deal of it. At the end of that particular hearing, Your Honor, the government conceded he was a bad witness. His testimony was shaky. It didn't come in well. It didn't come in as he expected. Nonetheless, the things that he said could have supported, if believed, could have supported the quantities that the court relied on. It is possible, Your Honor, but if you look at State v. Archer and they're talking about this issue, they believe that when you're using this type of evidence, it has to be solid evidence, and if you read the transcript of that particular hearing, I don't believe that the court can conclude that that evidence was in any way solid. I just want to be clear in my own mind. It's not a question of just the amount, but of what substance. As I understood your argument as to the 100 grams that he allegedly sold, he couldn't even be sure that it was crack. He said it might have been cocaine rather than crack, and there was some equivocation even with respect to those two sales. That's true, Your Honor, and he said it was a long time ago and I don't remember. All of that is part of that transcript. He was a witness that did not want to be testified any further. He went through a trial. He went through seven days of cross-examination. He was done, and the testimony at that hearing was just not solid. It wasn't credible, and the court's finding directly contradicts the jury finding of the upper end of his involvement. Thank you. Thank you very much, and you've reserved two minutes. Yes, please. Mr. Reeve. Good morning. The failure to give the theory of defense instruction in this case constituted a reversible error, and it was compounded in this case by the improper arguments of the government in its rebuttal summation. The government principally argues here that there was no factual foundation for the theory of defense that Mr. Santos pretended to be in an agreement with Mr. Wilson, but that's just not the case. What do you mean by pretended? I understand that before the alleged ripoff took place, assuming it was a ripoff, but let's accept that as a fact, he had engaged in three or four transactions that were he conspired to commit this crime with the intent ultimately maybe of ribbing him off, but he still had committed a crime. I understand what your Honor is saying, and I would answer it this way. The government in this case chose basically so they could aggregate quantity to solely charge on a conspiracy. They could have charged possession with intent to distribute on all four of those. They did not. The question and the defense that we raised was that everything that he did was designed to get him access to a large quantity of heroin so that he could rip Mr. Clark off. I understand that argument, but everything that he did could still be a crime. I think that's what the government is using the word ulterior motive. In other words, he's committing crimes. It may be his ultimate goal is to hit the jackpot and rip him off at the end, but that doesn't excuse the commission of the crimes that preceded it. But I would concede, and in fact we did concede pretty much in the opening statement, that he possessed with intent to distribute, but that's not the crime he's charged with. The crime he's charged with is conspiring, having an agreement, a meeting of the minds. Well, even as to those crimes, he had a meeting of the minds. I'm sorry, Your Honor? Even as to the preceding crimes, there was a meeting of the mind that he would commit them. Meeting of the minds. I understand. If you have another answer, another possible answer to Judge Corman's question, which is that the predicate for Judge Corman's question is the government's evidence that before the so-called rip-off, he went along with the conspiracy, conspiring to distribute drugs. But the jury was at liberty to disbelieve that evidence, and you didn't concede it. You may have conceded that he possessed drugs at certain times with intent to distribute them, but not that in the transactions preceding the so-called rip-off, he joined in the conspiracy for the previous crimes with the intention of then making the score later. Exactly. I couldn't have stated it that well myself, Your Honor. I think that is what the issue is here, and there is, I think, in this record, significant factual support. Clark, the defendant who's not here on submission, ripped off Mr. Wilson. Mr. Wilson conceded in his testimony he was an easy mark. Mr. Santos was an outsider. He wasn't trusted. The government said in its rebuttal submission something to the effect that there is no evidence of his state of mind. Correct. Which you argue was an impermissible comment on his failure to testify. But there's plenty of evidence of his state of mind. And the government, indeed, was relying on evidence of his state of mind derived from the actions of some of the philosophers of state of mind. Yes, Your Honor, and I think that the question is should the jury have been given an opportunity to evaluate it itself and to infer in the way the government suggests the evidence supported or to have a proper instruction so that they have a basis to analyze it. What you call the theory of the defense that you say you're entitled to instruction on, and I can't deny that you have some cases that seem to support your position, but really what you were arguing was that on the facts it's just a factual argument that you say the jury should not convict him, should not find him guilty beyond reasonable doubt because the government has failed to prove the things that the judge tells the jury are essential elements. It's one thing when the theory of the defense is something like entrapment where in order to understand it, the jury would need to be told some principles of law that are other than just what are the essential elements of the offense and the reasonable doubt charge. But all you're arguing in this case is, well, I'm telling you that the government didn't prove its case beyond a reasonable doubt because they only proved that he did certain things, but they haven't proved that he really was conspiring because we argue that his intention was this ripoff. It's no different from, for example, if the defendant says the government's case rests on a witness who has bad eyesight. Is the judge compelled or the government's case depends on witnesses who have a great interest to name my client when they really were the ones who did it on everything that a defendant argues is a reason not to find proof beyond reasonable doubt? It doesn't make much sense to me. No, I agree with the court in general, but I think here… What's different about this? What's different here is, first of all, that the court's general charges on the element of agreement did not provide the foundational legal basis for the argument I made. And, indeed, that's why the government stood up in its rebuttal and said this is a nonsense argument. It's not a legal defense at all. Did the court say you must find a meeting of the minds, that the defendant joined in the conspiracies? And you say, no, he didn't. His objection was not to do more than the government. Why is that just a negation of the proof of his instructions? Because I don't think that a jury that's not instructed at all, that's then told by the government in its argument that this is not a legal defense at all, and is then not told anything by the judge about whether it is or isn't a legal defense in the complicated area of narcotics cases where you have buyer-seller defenses, where people can be involved and actually, as Judge Corman indicated, be involved in actual transactions but not be guilty of conspiracy. This is a very complex area, and the jury here was given no basis, no construct. And I think that's what distinguishes this case, Your Honor, from the situations that the court just alluded to. Thank you. Thank you very much. Mr. Silverman? Good morning. May it please the Court. My name is Mark Silverman. I represent the United States in this appeal, as I did in the district court proceedings. I'll pick up on the last colloquy, which had to do with the ripoff defense propounded by Defendant Santos. In the government's view, the defense that was proposed suffered from two fatal flaws. The first was that there was, as the district court ruled in her post-trial ruling, no evidence whatsoever that Mr. Santos' state of mind from the starting gate in October 2011 was to rip off Kevin Wilson. None. Wasn't there evidence that he made off with the drugs and didn't pay, and they regarded him as being contrary to the purposes of the conspiracy rather than joining in? Or wasn't there? Am I not right that he did not pay for the drugs? The last acquisition of heroin was in December 2011. Yeah, that's what I'm talking about. Right. And I don't mean to skirt around your question, Your Honor. The evidence was that Mr. Santos did not pay. He had fallen out of touch with Mr. Wilson. A few days later, he called or texted Mr. Wilson and said he'd lost his phone. That assuaged Mr. Wilson's concerns. Then he fell out of touch again until later in December when Mr. Wilson heard from someone who reported to be his younger brother who represented that Mr. Santos was in jail, and they'd work it out when he got out. It was a stipulation presented to the jury that Mr. Santos, in fact, was in jail. And so it's true that he did not pay for the last acquisition of drugs, but there was an explanation given that undermined the ripoff. Yeah, but he wasn't in jail during the time or period that he was missing. It was a nine-day period when he was not in jail and he was out of contact. Right, and that was an explanation that he had lost his phone. So there were a few days that go without explanation. I understand that. You're saying that because there are arguments that his intentions could have been other than the ones he's contending for, that means there was no evidence? No, Your Honor. I think my contention is that the— Government every day of the week argues to juries about defendants' intentions based on actions, because that's the only way you can prove intentions. And I don't think you would subscribe to the proposition that just because somebody can muster up arguments that they don't necessarily show that but might show a different intention, that means there's no evidence of intention. No, Judge LaValle, I'm sorry. I was trying to answer your question about the facts as to what happened with that— You said there was no evidence of his— And my argument, though, is that even if Mr. Santos had ripped off Kevin Wilson in December 2011, that doesn't reveal his state of mind in October 2011. As Judge Corman asked during the colloquia earlier of my colleague, Mr. Santos, in fact, made an agreement with Wilson and then executed that agreement for several months. He engaged— That was your evidence. That is the evidence that was presented at trial. Yes, Your Honor. But the jury might disbelieve you. Isn't that correct? I suppose that they could decide, as Your Honor pointed out, that there was no meeting of the minds, except that the only evidence, as I view it, reflected in the record, was that Mr. Santos and Mr. Wilson jointly acquired and distributed heroin. Suppose the jury accepts the proposition that they met at the earlier date, they discussed the proposition of dealing in heroin, that Santos pretended to agree to a conspiratorial relationship, but really was intending to rip off as soon as they gave him drugs. And supposing the jury disbelieves or simply reaches no conclusion about your evidence of anything that happened from then until the transaction that he didn't pay for, so that the jury just doesn't find—accepts your evidence on that other stuff, so that the next transaction the jury accepts is the one that he then disappears and doesn't pay for. Why isn't that some evidence supporting his contention that he intended from the first to rip off? Your Honor, I suppose my answer would be twofold, if I may. The first is that there's nothing revealing Mr. Santos' state of mind other than what happened, I suppose, in December 2011. That's always true in every case. Every case depends on what happened. There's never any evidence. There's never a film of the person's state of mind. That's right, except for a situation like in Durham, the Durham case on which my adversary relies, which makes clear that there was testimony of Durham's co-defendant at trial, in which the co-defendant made clear that it was their agreement, Durham and the co-defendant, to dupe the agent into giving them an advance payment for the arson, which they then took, and they had no intention whatsoever of carrying forward with the arson. That's materially different from our case. But there's evidence. No, there's some evidence. But, Your Honor, I think there's a second argument here that I'd like to walk through with the Court, which is that the rip-off defense presupposes that someone cannot have two intentions at the same time, that this pretending to agree would be mutually exclusive, this intent to rip-off would be mutually exclusive of intending to enter into a conspiracy. That's not the case. Someone can have two motives for a transaction. That's the principle the government was trying to draw out of the Boone-Fochte case, where the Court held that the instruction that had been proposed by the defendant was inappropriate because it might have suggested to the jury that an intent to rob and an intent to distribute heroin were mutually exclusive. While the evidence could have supported a finding, the defendants intended to do both. So here, even if the jury would have accepted Your Honor's argument that, and I don't mean to phrase it as an argument, but in your hypothetical that the jury rejected the government's theory behind the intent driven from his actions, that does not exclude that he entered into the agreement with Kevin Wilson. The only evidence… …that the agreement to receive drugs for the purpose of distributing them violates his agreement of conspiracy, even if, at the same time, he has no intention whatsoever of giving them the money, but intends to get the drugs from them, use them to distribute only for his own benefit, not for theirs. Well, I guess what I'm saying is that for the period of time in which Mr. Wilson and Mr. Santos jointly acquired and distributed heroin, they were in agreement to do just that. It's a violation of 21 U.S.C. Section 846. If, at some later point, Mr. Santos was going to do the ripoff, even if he harbored that intent the whole time, he still had two intents. One of them makes him guilty of the offense which the jury convicted him of. Well, I appreciate Your Honor's comment on that. Thank you. I think that that is a fair argument to have been made. It may not have been the basis on which the judge decided not to give the instruction, but it was one the government presented to the judge as well as to the jury in a rebuttal summation that we believe was entirely appropriate. I can point the court to the appendix submitted by Defendant Anderson at page 1889 in which the government made clear that Mr. Santos still necessarily had to engage in all of those four transactions and participate in the conspiracy in order to make that happen in December, that that refers to the purported ripoff. So even in that sense, this is just not a defense. You're saying that if, assuming that Santos met with Wilson and made an ostensible agreement to receive drugs from Wilson, all the time saying to himself, this Wilson guy thinks he's going to get money out of this, but I'm just going to get the drugs from him and use them for my own benefit, distribute them for myself. Indeed, I'm going to kill Wilson if he comes around looking for the money. Would he still be in the offense? Yes, Your Honor. The offense has nothing to do with money. It has to do with the truth. Yes, Your Honor. I'll be interested in Mr. Reed's answer to that. Thank you, Your Honor. I ask you, why did you object to this instruction? You didn't object to him arguing this to the jury. Right, Your Honor. It strikes me that sometimes objections are made for no particular practical reason, and then they become the object of a lengthy argument by appeal. You let him make the argument. Yes, Your Honor. I appreciate the point, and I appreciate it more standing here at the podium than before. But I will say that our view, the government's view at the time that the jury instruction was proposed, was that there was not an evidentiary foundation for it. I understand that Judge LaValle and I have had some colloquy on that issue. I continue to believe that there was no evidence for it, and the law requires that in order to receive a theory of defense instruction, there must be some evidence. It's a low threshold, but there's still a threshold. It's an extremely low threshold. Aside from the person who had ripped off Wilson first, he was recommended by that guy, your client. The defendant, rather, was recommended by the person who had done the first rip-off. Yes, Mr. Wilson and Mr. Clark had been partners. Mr. Clark had done the first rip-off, and it was because Mr. Clark had spoke positively of Mr. Santos' ability to move heroin that Mr. Wilson approached Mr. Santos. That's right. But in preparing for argument, I did go back and look to see if there was any evidence that Mr. Wilson had informed Mr. Santos of that first rip-off. There was not. I looked at appendix page 1006 and also at appendix pages 1366 through 1369. When Mr. Wilson approached Mr. Santos, he didn't reveal the rip-off. Now, Mr. Santos may have known of it, but that's speculation as well. That's nowhere in the record. There was a connection between Santos and the first rip-off. Clark was the first rip-off. They had known one another. They had moved drugs together before, but that doesn't necessarily mean that Mr. Santos was aware of that first rip-off. The standard is this low. Yes, Your Honor. And the other point that I would make then is that, and it goes to my second argument with Judge LaValle, is that the instruction was not a defense. In this case, it's our view that if he harbored both intents, he harbored both of them. And so it would not lead a jury to acquit Mr. Santos because they still had to find a meeting of the minds. And that meeting could have been reached even if Mr. Santos harbored this ulterior motive the whole time. So our argument was that— You're saying that in order for the judge to instruct the jury properly on the defense theory, the judge would have had to also give the argument that you're making now, that the intent to essentially steal the drugs in the sense of not paying for them afterwards and keeping the money for himself does not negate the existence of the conspiracy to be involved in the transfer of the drugs? I think that's right, Your Honor. And a judge wouldn't be abusing her discretion to decide that that would have been a confusing area, and it may have been more straightforward to simply instruct that the government had to prove beyond a reasonable doubt that there was a meeting of the minds with respect to the conspiratorial agreement. The judge did that in this case. By court, you're saying that this was not a defense to the charge, but saying that his intention to steal the money would not make him innocent. Correct, Your Honor. That's not a theory of defense. Right. So my brief accepts it as a theory of defense. A theory of maybe sentencing or something else, but not defense. And the way we presented it to the district court as we were discussing the charge was that at most this might show he abandoned the conspiracy in December 2011, that he went forward with the ripoff. But prior to that time, as Judge Corman's questions made clear earlier, Mr. Santos engaged in the conspiracy. He carried out his agreement with Mr. Wilson for almost two months with more than 500 grams of heroin that they jointly acquired and distributed, received money back to go get more from Wilson's source of supply in New York. If there are no further questions on this topic, I'd like to turn to the sentencing issues that had been raised by my colleagues during their arguments. You're going to talk about Mathis. Yes, Your Honor. I'll go right there. Why don't you go to that? Very good. So as I understand it, Mr. Anderson's argument in the briefs has now transformed. He's been given a gift by the Supreme Court in the sense of this Mathis case that has come down. Mathis articulates a framework whereby sentencing courts can only apply the modified categorical approach if the alternatives listed in a state statute are considered elements. So it draws a means-element distinction and says you don't get to apply modified categorical if these alternatives are means of committing an offense versus elements of the offense. As Judge LaValle pointed out during questioning, there is an action listed in the Connecticut statute that we're talking about, that's Section 21A, 277A, which is a mere offer to sell. This court in the savage decision of 2008 held that that falls beyond the parameters of what would constitute a career offender predicate. So we're too broad. This conviction does not count categorically. So the next question is, does Mathis apply to the guidelines? Because Mathis is a case that arises in the context of the Armed Career Criminal Act. The government's position is that it does, although the Sixth Amendment concerns are different from the ACCA context than they are in the guidelines context. It's the government's position that the Mathis framework, that is the means versus elements test, applies in the guidelines context. The next question this court would have to answer is whether then those verbs listed in the alternative in the Connecticut statute, that's possession with intent to sell, possession with intent to dispense, dispense, offer, distribute, manufacture, are those means or are those elements? Now, the savage decision I alluded to earlier takes them as elements. It refers to them as elements a few times, but, of course, savage comes down pre-Mathis. There's not the same emphasis on this means-elements distinction. So the government did some research into Connecticut state law and found a case, State v. Jackson, 13 Con App 288 in 1988. It's almost 30 years ago where the Connecticut Intermediate Court took a look at the definitions of sale and dispense and held the following. An examination of the statutory definitions of sale and dispense would ordinarily require a conclusion that they are conceptually distinct from each other and that, therefore, a specific unanimity charge on each of them would be required. So what the state is saying in this case, what the state court is saying in this case, is that when those different verbs, those different actions in the Connecticut drug statute are in play, if those actions are conceptually distinct from one another, then the jury must be unanimous as to which one was committed. The Mathis case uses jury unanimity as a shorthand for determining whether something is a means or an element. And under that shorthand, then, these alternative actions are elements, which means that the sentencing court would be able to apply the modified categorical approach to peek behind the conviction to determine whether, under Shepard's degree of certainty, we have the ability to exclude a mere offer to sell as the predicate. Here, we do. When you look at the state court transcript... Then we have the benefit, if you're right about all of these things, of the United States people reading it. Yes, Your Honor. And so when... I'm sorry, is there more to that? No. And so when looking at the state court plea transcript in this case, the prosecutor's factual basis recited for the court, irrespective of whether it had anything to do with the arrest report, and the prosecutor never references the arrest report, makes clear that the defendant possessed... Well, he ran from the police, he discarded three bags while he was running, they possessed 11.3 grams of suspected crack cocaine, which tested positive. This was no mere offer to sell, an offer to sell without possession. This was someone who actually held 11.3 grams of crack, that's roughly three apples, that he intended to sell. The modified categorical approach is satisfied. There is no error under the Mathis framework. I should point out, before I move on, that Mr. Anderson, in this case, received a sentence of 96 months. The career offender range was 262 to 327 months, and the district court said that's excessive. Under 3553A, the appropriate sentence is 96 months, which was the top of the non-career offender range. So before this court even dives down the rabbit hole of Mathis, there is a consideration that perhaps the guidelines range, the career offender guidelines range that the court calculated didn't even have an impact on the district court's analysis. It is a preliminary question I think this court should look at. Yes. Yes, Your Honor, I'd be happy to. I will, Your Honor. Yes, Your Honor. Could I ask you, I just want to be sure I have the right case in mind, did she say that she would have given that sentence anyway? Or was that in the? What I'm saying, the district court, at sentencing, calculated the career offender range. No, no, and she gave him 96 months, and did she say it wouldn't have mattered what the career guidelines were? I don't remember whether it was with respect to your client. It was not as explicit as that. It was not? Not for this particular defendant. And how do you answer your adversary's argument that when the defendant said that the prosecutor's presentation was correct, that he said basically? I think it puts far too much weight on the word basically than it can bear. This court, in a recent summary order in the United States v. Edwards, had the same exact scenario and had no problem denying the challenge. In that case, it was an ACCA, an Armed Career Criminal Act enhancement. But it had been based on the same premise where a district court, I'm sorry, a Connecticut state court had accepted a factual basis where the defendant had confirmed that the facts were basically what had happened. This court had no problem. If I could turn briefly to Defendant Bryant's challenge to his sentence, here the error claimed has to do with the drug quantity attribution reached by the sentencing court. I respectfully disagree that the sentencing transcript, the fatico hearing transcript is not clear. Kevin Wilson is clear that when he said Bryant admitted to him that he was moving 100 grams a week, that that was crack. There's some back and forth on that issue, but that is exactly how Mr. Wilson testified at the trial and at the fatico hearing. The district judge? We are from the fatico hearing. It was 100 grams of what? It had to be 100 grams of crack. It was 100 grams of crack. No, no, but did he say? He does at different points in the fatico hearing, yes. I can refer the app here on it. I'm going to have one moment to pull this up. GA-105, GA-108. GA-138 to GA-139. My reading of the fatico hearing transcript is on each of those occasions it was specifically referenced to crack cocaine, as it had been at the trial, that's CA-109. Did he go back on it at all during the fatico hearing? On cross-examination, he softened it, but he reaffirmed it on redirect. Then is it clear that the references that you point to where he's clearly talking about crack, that that applies to his statement about 100 grams a week? Yes, Your Honor. That's how I at least read the transcript, and I'd urge the court to take a look at those pages. You were in trouble by the fatico hearing, and you even backed off what you were originally asking for because the testimony was so problematic. I mean, there's a lot that turns on this. Yes, Your Honor, but I would be careful here. The government's discomfort was that originally Mr. Wilson seemed to be able to specify a time frame for the crack phase of Mr. Bryant's drug distribution. At the time of the fatico hearing, he did not. He said that he could not testify with certainty as to how long that went on. He knew that it was more than one week, and he stood by the 100 grams per week admission Bryant had made to him. And so the government, faced with that testimony, I think appropriately backed off of a higher quantity to a quantity that the district court could comfortably find based on that testimony. The district court did expressly credit Mr. Wilson's testimony, and so this court would have to find an abuse of discretion in her factual crediting of that witness in order to overturn the crack quantity attribution. I see that I'm over my time. If I could have just a moment to address the argument that the district judge should have been bound by the jury's finding. Of course. I think it's just contrary to the case law of this circuit. The Vaughn case and the Jacques case, both of which are cited in the government's brief, make clear that a sentencing judge can go higher than a jury's quantity attribution, and that's for good reason. A sentencing judge is working with a lesser standard, right? A jury has to find quantity as charged and as it relates to statutory penalties beyond a reasonable doubt. A sentencing judge has a preponderance of the evidence standard that they're facing. Which of the cases are you just citing? The Vaughn case and the Jacques case. Jacques v. Vaughn is the main case that you're alluding to. Yes, Your Honor. It's a 2005 case from this court. The other reason is that a jury is looking solely to determine guilt based on what's charged in the indictment, whereas it's clear that at sentencing, a district judge can and should look to the offense conduct as well as relevant conduct. And so there's two reasons why a district judge should not be bound by a jury's finding. I know that my adversary in a 28-J letter to this court cited a case out of the Ninth Circuit, a recent decision. I point out that that case is not yet final. The government has until October 12th to file a petition for rehearing in that case. But I also point out that it's an out-of-circuit case that in my view at least conflicts with the Vaughn case and the Jacques case out of this circuit. Mr. Silverman, so actually I'm going to revise the schedule a little bit. I'm going to ask you, if you can, to submit a letter by Tuesday, close of business. Yes, Your Honor. And then I'll ask Mr. Maringolo to submit a response, if he wishes, by Friday of next week, close of business. Is that fair? Your Honor, just so I'm clear, the letter should address the Mathis issue in particular. Correct. Thank you. If there are no further questions, the government will rest on its brief with respect to the remaining challenges and ask this court to affirm the judgments. Thank you. Thank you. Mr. Maringolo. Pass. Mr. Maringolo. Your Honor, Vaughn and Jacques, as I said, involved ranges of narcotics. And a jury made a finding of the ranges. But all you can tell from the range is the bottom end of that range. You don't know what else they found. So under U.S. v. Watts and other cases, I think the district court would be justified in going into a calculation of quantity to determine exactly what an appropriate sentence and guideline range is. Here we do not have a range. We have a specific factual finding of a specific factual amount, less than 28 grams. I think if the issue is left unresolved, the district court can make findings. What about the difference in standard of proof? At a sentencing hearing as opposed to a trial? Your Honor, I don't think that applies at all. You have the jury making an essential factual finding of an element. They must make the unreasonable doubt. Which they did. Now you have a judge that's going to find an absolutely contradictory finding and ignore the jury's finding. I think that is a Sixth Amendment violation. Why do you say it's contradictory? Oh, I'm sorry. Well, if the jury says we find it's under 28 grams, after hearing the exact same evidence. Oh, no. We find that we – it's essentially that we can't find beyond a reasonable doubt that there's more than 28 grams. And the judge determines that based on a preponderance, I think it's significantly more than 28 grams. Why is that contradictory? If that issue was unresolved by the jury verdict, then yes. The judge at sentencing would have every right to go forward with his own calculation on a different standard of proof. But here, I think the court, and as Pimentel-Lopez says, the court is bound by that factual finding by the jury. And if it ignores it, you have a Sixth Amendment violation. There was nothing unresolved by the jury's determination. And your only way of distinguishing Vaughn is that Vaughn involved a range? Yes. From 50 to 100? Yes. But there's a similar range in one sense here, right? It's just below 28. I guess it would be 1 to 28, and the jury found it was – Is there any other basis that you want us to consider in distinguishing Vaughn? No. Thank you very much. Thank you. Mr. Reed. I wanted to, I hope, directly respond to some earlier questions. And first of all, say I couldn't disagree more with the government's representation in response to Your Honor's questions about what would that result in. I think under that scenario, there should be – What is that? There was a colloquy, and you said you would be interested in what Mr. Reed has to say about that. And I didn't want to disregard it, but it was the situation where you were talking about what if Ms. Santos was willing to kill him? Would there still be an agreement? The government is saying that if you agree, if two people agree together that one is going to transfer drugs to the other as part of a distribution thing, the fact that the second one intends, contrary to the ostensible commercial agreement, instead of giving the money, the proceeds of the distribution, to rip it off and not cooperate at all, the government is saying you've still agreed to receive the drugs. Right. And I disagree with that, and I think that the cases, especially Durham and this court found it was a reversible error not to give the instruction that where the defendants intended to steal, that that undercut agreement. And then they say they rely on Boone-Pakde in support, but in fact, in Boone-Pakde, the district court judge did give an instruction. He toned down the instruction that was requested by the defense because the defendant intended to steal, you must acquit. And that's what led the court to say, well, wait a minute here. So that case, in fact, supports our position. And, you know, when you talk about, well, maybe the instruction should have said something else, I think the problem here is the failure to give any instruction on this led precisely to the government being able to stand up and say there's no defense here at all and to make that argument, and the judge remained silent. And that really – I don't see how you can find that that didn't prejudice his right to present that defense. Thank you very much. Thank you. We'll reserve decision and we'll hear arguments.